UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-20674-DPG

UNITED STATES OF AMERICA,

       Plaintiff,

v.

BORIS ARENCIBIA,

       Defendant.

_____/

## DEFENDANT BORIS ARENCIBIA'S RESPONSE TO NON-PARTIES' MOTION TO QUASH SUBPOENAS FILED NOVEMBER 6TH 2024 [DE 1025].

Defendant, BORIS ARENCIBIA ("Mr. Arencibia"), through undersigned counsel, files his response to NON-PARTIES, Rene Lorenzo and Carlos Casanueva's motion to quash subpoenas filed on November 6th, 2024. [DE 1025].  In support thereof, Mr. Arencibia states:

### I.  RELEVANT PROCEDURAL HISTORY & TIMELINE OF CHARGED CONSPIRACIES

A Grand Jury indicted Mr. Arencibia on December 20, 2023, in a Fifth Superseding Indictment in this case that was originally filed in 2019. [DE 865].  The Fifth Superseding Indictment charged three (3) conspiracies, all occurring "from around January 2013, and continuing until on or about May 28th, 2019. [Id.]. Mr. Arencibia was arrested on or about January 26th, 2024, and held on a joint stipulation of temporary pre-trial detention until a formal bond hearing could be conducted. [DE 876].

On or about February 7th, 2024, Mr. Arencibia was arraigned, and a formal bond hearing was held before the Honorable Magistrate Judge Lauren Fleischer Louis. Magistrate Louis ordered Mr. Arencibia detained based on a finding that he was a risk of flight. [DE 881].



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

On or about February 13th, 2024, the Court granted an agreed motion to continue the trial of Mr. Arencibia and codefendant Stephen Costa from February 20th, 2024, to October 7th, 2024. [DE 885].  Mr. Arencibia has remained incarcerated since his arrest in January [DE 892] and is the only Defendant in custody.

A Sixth Superseding Indictment [DE 927] was returned, on May 8, 2024, adding two (2) codefendants, Gustavo Linares Guzman ("Defendant Linares") and Jose Armando Rivera Garcia ("Defendant Rivera Garcia"). The 6th Superseding Indictment maintained the same three (3) conspiracy charges and the same time frame, i.e., January 2013 to May 28th, 2019.

The other remaining codefendants, Stephen Manuel Costa and Angel Caminero Alvarez had been previously indicted as part of the Second Superseding Indictment on June 10, 2021, and the Superseding Indictment on December 12, 2019, respectively. Defendant Angel Caminero Alvarez is a fugitive.  Co-defendant Costa, upon information and belief, has been cooperating with the Government since at least December 2021, if not prior thereto.  *See United States v. Stephen Costa,* 15-cr-21004-Altonaga. Defendant Costa has had a supervised release violation pending since at least December 21, 2021. *See Id. at* DE 79-126. No Defendant, to the undersigned's knowledge, has ever had a supervised release violation hearing pending in this district for almost three years. Upon information and belief Costa went to prison in 2016 and was released in 2019 or 2020. The alleged property transfers would have occurred before Costa went to prison in 2016 and/or before 2021.  Costa has an upcoming change of plea hearing in this case scheduled for November 12, 2024.

The case was set for trial commencing on the trial period for November 18th, 2024. However, on October 30th, 2024, Co-Defendant Linares-Guzman filed a motion to continue trial citing a scheduling conflict and requesting that trial be moved to the December 4th, 2024 trial calendar. [DE 1019]. On November 8th, 2024, the Court entered an order granting Co-Defendant Linares-

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

Guzman's motion for continuance and re-scheduling the trial for the trial period commencing December 2nd, 2024. [DE 1029].

## II.   THE GOOD FAITH BASES FOR THE SUBPOENAS AND THE REQUEST FOR THE DOCUMENT PRODUCTION

The time period set out in the subpoenas was dictated by the Government and not by the undersigned. As stated above, the time-period alleged in all three (3) charged conspiracies is from January 2013 to May 28th, 2019 (a 6 ½ year period). Discovery provided by the Government, specifically interview reports (ROI's) of Government witnesses, Mohammad Salemi and Carlos Gonzalez (Gonzalez is Defendant Costa's brother-in-law) state:

**Salemi ROI dated 12/1/20 attached as *Exhibit A*:**

> Costa used his cousin Casanueva to handle his real estate transactions and hide money away. Casanueva was also Costa's contact for drugs coming from New York. Salemi had heard that Costa had buried barrels of cash in his uncle's backyard, Rene Lorenzo, under slabs of concrete.

*Exhibit A at page 12 of 13.*

**Gonzalez ROI dated 6/17/21 attached as *Exhibit B*:**

> Costa placed all of his assets in the names of his trusted family members. He had a warehouse in the Tampa/St. Petersburg area that he sold and put the money in his wife's name. Costa purchased a property on 211 Davis St., which was also the name of a company Costa used. That property was under Gonzalez' name. Costa's uncle, Rene Lorenzo, was one of his most trusted family members. He had properties under his name that belonged to Costa in reality. Lorenzo lives in Weston, Fl. Carlos Casanueva used to be very involved with Costa and held properties under his name, but he got out and moved up north with his family.

*Exhibit B at page 2 of 3.*

## III.   ATERIALITY, RELEVANCE AND ADMISSIBLITY OF THE INFORMATION REQUESTED:

***The Testimony of the Non-Party Witnesses*:**

First, the non-parties do not allege that their expected testimony is not relevant to Defendant Arencibia's defense nor as impeachment witnesses, nor do they deny the proffered

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

evidence provided by the undersigned to their counsel. *See Exhibits A & B respectively*. Instead, their counsel argues that the Government's discovery does not "show any transfers to Messrs. Lorenzo and Casanueva" and therefore this Court should quash the subpoenas.[1] [DE 1025 at page 3]. No statements under oath have been provided by Messrs. Lorenzo or Casanueva to refute the allegations by the Government witnesses in *Exhibits A & B* attached.

At a minimum, the testimony of these two (2) non-parties would be material, relevant and admissible to either impeach Gonzalez and Salemi, both of whom are testifying against Defendant Arencibia, if the non-parties testify that the allegations made by Gonzalez and Salemi are not true; and/or they would provide impeachment testimony against Costa who is cooperating and also testifying against Defendant Arencibia.

**The Categories of Documents Requested:**

Defendant Arencibia, in addition to the nonparty witnesses' testimony at trial, has requested production of three (3) categories of documents directly related to the allegations made by Gonzalez (a trusted Costa family member) and Salemi (a trusted Costa business partner and co-conspirator). The documents are clearly relevant to the Defendant's defenses at trial and as impeachment against Government witnesses, Gonzalez, Salemi, and/or Costa.

Category 1: communications, i.e. text messages, Whatsapp messages and/or emails between each non-party and Costa from 2013 to the present.[2] The communications sought relate to receipt of funds and transfers of property from Costa as set out in categories 2 & 3.

---

[1] If the Government is not aware of the specific transfers and locations of the properties, of course it is not going to have any documentation showing the transfers. Upon information and belief, the Government has not sought or obtained statements from Lorenzo or Casanueva.

[2] Again, the time frame was dictated by the Government, from 2013-2019, in the Sixth Superseding Indictment. The undersigned added an additional and more recent time frame (2019-present) because Costa has been on bond since at least 2020 even though he has had a supervised release violation hearing pending before Chief Judge Altonaga since 2021.



Category 2: bank statements showing any monies received from Stephen Costa from 2013 to the present. Each non-party witness would know if they ever received any monies from Costa and when they received the funds. If they do not have any bank records that would show they received funds from Costa they can simply file a response under oath advising that no such documents exist.

Category 3: copies of any and all warranty deeds, quit-claim deeds, bills of sale for any property, real or personal, that was purchased with funds received from Stephen Costa from 2013 to the present. Each non-party witness would know if they ever purchased any property, real or personal, with funds received from Costa and what property was purchased. If they do not have any deeds or bills of sale that would show they purchased property with funds received funds from Costa they can simply file a response under oath advising no such documents exist.

Thus, the documents if they exist would be material, relevant, and admissible through these non-party witnesses for impeachment purposes at a minimum.

## IV.  LEGAL STANDARD AND ANALYSIS

Rule 17(c) of the Federal Rules of Criminal Procedure governs the use of subpoenas duces tecum in federal criminal proceedings. *See United States v. Silverman*, 745 F.2d 1386, 1397 (11th Cir. 1984). "A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." Fed. R. Crim. P. 17(c)(1). "On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." *Id. 17(c)(2)*. A party seeking to subpoena documents "must clear three hurdles: (1) relevancy; (2) admissibility; [and] (3) specificity." *United States v. Nixon*, 418 U.S. 683, 700 (1974) (alteration added); *see also United States v. Marshall*, No. 07-20569-CR, 2008 WL 2474662, at *1 (S.D. Fla. Jun. 17, 2008) (acknowledging *Nixon* as the legal standard). A

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

"subpoena for documents under Rule 17 'was not intended to provide a means of discovery for criminal cases'" but to "'expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials.'" *United States v. Brown*, No. 11-60285, 2013 WL 1624205, at *3 (S.D. Fla. Apr. 15, 2013) (quoting *Nixon*, 418 U.S. at 698–99). The application for such a subpoena must be made in good faith and "not [be] intended as a general 'fishing expedition.'" *Nixon*, 418 U.S. at 700 (alteration added).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401 (alteration added). "Courts have noted that the specificity and relevance elements are somewhat heightened in that they require more than the title of a document and conjecture as to its contents." *Brown*, 2013 WL 1624205, at *4 (citation and internal quotation marks omitted). Rule 17(c) "only reaches specifically identified documents that will be admissible as evidence at trial. . . ." *Silverman*, 745 F.2d at 1397 (citations omitted).

"Enforcement of a pretrial subpoena duces tecum must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues." *Nixon*, 418 U.S. at 702. "Without a determination of arbitrariness or that the trial court finding was without record support, an appellate court will not ordinarily disturb a finding that the applicant for a subpoena complied with Rule 17(c)." *Id*. (citations omitted).

In the Eleventh Circuit, "impeachment materials may be subpoenaed by a Rule 17(c) subpoena" if relevant and specific. *Brown*, 2013 WL 1624205, at *4; *see also United States v. Thompson,* 310 F.R.D. 542 (S.D. Fla. 2015) (Compliance with defendant's request for Rule 17 subpoena for nonparty to produce documents not unreasonable or oppressive in prosecution for multiple counts of health care fraud where defendant and nonparty reached agreement to limit

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

scope of subpoena and time period within which to comply. Requested documents, when limited to defendant's revised request, were sufficiently relevant to defendant's defense, were likely admissible at trial, and were specifically identified to extent possible, and extended time period within which nonparty was required to produce documents provided nonparty with sufficient time to comply and also satisfy Rule 17's goal to expedite trial by providing time and place before trial for inspection of subpoenaed materials.);  *In re Martin Marietta Corp.,* 856 F. 2d 619 (4th Cir. 1988) (defendant charged with mail fraud in connection with Government's investigation of his employer, a defense contractor, was entitled to production of specific documents by employer which were relevant to his defense).

In *United States v. Lazaro Collazo,* Case No. 14-CR-20550-ALTONAGA, a very similar situation occurred. The undersigned, as counsel for Collazo, served two (2) Rule 17 subpoenas on non-parties for production of documents pre-trial. The non-parties, USAO-SDFL and Major League Baseball (MLB) filed motions to quash the subpoenas. The Court "Granted in Part and Denied in Part" the non-parties' motions to quash the subpoenas. *See [DE 229] in Case No. 14-CR-20550-Altonaga, a copy is attached for the Court's convenience as **Exhibit "C"**.* The Court ordered MLB to produce the records requested in the Second and Fifth Categories of requested documents finding that the Defendant had made a good faith showing of relevance, admissibility and specificity. *Id.* @ pages 6-9.

Just like in *Collazo,* the Defendant, Arencibia, has requested production of specific documents that relate to payments by Government witness Costa, a co-conspirator, to the non-party witnesses' documents related to transfers of property by that co-conspirator to the non-party witnesses, who are trusted family members, and bank records showing deposits and/or transfers of funds received from that co-conspirator by the non-party witnesses. Defendant Arencibia has also

requested evidence of communications between the non-party witnesses and that co-conspirator related to the above categories. As Judge Altonaga held in *Collazo*:

### 1. The Second Category

As for specificity, while it is true Collazo does not identify specific documents evidencing payment or other agreements between MLB and the individuals or entities — for instance, a dated receipt to a specific person — his request is sufficiently specific to satisfy Rule 17(c). By confining the request to documents "concerning payments," Collazo makes a good- faith, specific, and relevant request for information. Further, Collazo points out that payments or benefits conferred upon a witness are admissible for purposes of impeachment. In the Eleventh Circuit, "impeachment materials may be subpoenaed by a Rule 17(c) subpoena" if relevant and specific. *Brown*, 2013 WL 1624205, at *4. MLB argues the admissibility of this evidence depends "on whether and to what extent the witness in fact testified and incriminated the defendant, and whether the agreement provided some inducement to testify in some way regarding the defendant. (MLB Resp. 11 (citing *United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988)) (footnote call number omitted)). Yet, as noted in *LaRouche Campaign*, "Observation of this general rule [that impeachment evidence is only permitted if the witness testifies], however, is left to the sound discretion of the district court." *LaRouche Campaign*, 841 F.2d at 1180 (citation omitted). Exercising its discretion, and noting the witnesses who will testify are not yet known, the Court finds Collazo's second category proper in part."

*Id.* @ 7 & 8.

### 2. The Fifth Category

Collazo does not address MLB's admissibility argument in the relevant section of the Reply. (*See* Reply 35–36). Instead, he argues the "reliability of these records [is] critical to the charges" and the list is necessary to verify the authenticity of the records. (*Id.* 36 (alteration added)). Still, throughout the Reply, Collazo makes a number of arguments the requested documents could be used as impeachment against witnesses. (*See, e.g., id.* 10–11). The Eleventh Circuit has sanctioned the use of a subpoena to obtain out-of-court, written statements intended for use as impeachment against the defendant, a prospective witness. See *Silverman*, 745 F.2d at 1396 (noting subpoena sought "complaints made against him by his former clients or The Florida Bar"). Similarly, the statements Bosch previously produced to MLB concerning the medical records' modification or destruction could be used to impeach his expected testimony about the accuracy of those records. As with the second category of requested

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

documents, the scope of this request is limited, specific, and clearly relevant. Accordingly, the fifth category is permissible.

*Id. @ 9.*

In the instant case, the non-party witnesses will testify on the defense case, as either impeachment witnesses against Government witnesses Gonzalez and Salemi and/or as impeachment witnesses against Costa for withholding evidence of ill-gotten gains/assets from the government.

## V. THE MOTION TO QUASH IS UNTIMELY AND THEREFORE THE NON-PARTIES HAVE WAIVED ANY OBJECTIONS TO THE PRODUCTION OF DOCUMENTS

Rule 17(c)(2) states that "On motion made promptly, the court may quash or modify the subpoena." *Rule 17, Fed. R. Crim. Pro.* Rule 17 is substantially the same as Rule 45, Federal Rules of Civil Procedure. *See Advisory Committee Notes in Rule 17.* Rule 45(d)(2)(B) clearly states that a person commanded to produce documents or tangible things or to permit inspection may serve a written objection on the party designated in the subpoena. However, the objection **must be served** before the earlier of the time specified for compliance or 14 days after the subpoena is served. *Id.*

The subpoenas in this case were served on October 22nd as to Mr. Lorenzo and on October 24th, as to Mr. Casanueva. *See Exhibits A & B to Motion to Quash [DE 1025].* The time specified for compliance on both subpoenas was November 4th, 2024. *Id.*

The non-parties filed their motion to quash the subpoenas on November 6th, 2024, 2 days after the time specified in the subpoena for compliance. As a general rule, when a party fails to timely object to interrogatories, production requests or other discovery efforts, the objections are deemed waived. *Bailey Industries v. Clip Inc.,* 270 F.R.D. 662 (2010); *see also In re United States,* 864 F.2d 1153, 1156 (5th Cir. 1989). This is so even though a party had an objection to make. *Jaffe v. Grant,* 793 F.2d 1182, 1190 n. 6 (11th Cir. 1986) (objection based on Fifth Amendment waived by

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

failure to timely assert such privilege in response to discovery*)*; *Peat, Marwick, Mitchell & Co. v. West,* 748 F.2d 540 (10th Cir. 1984) (same as to work product).

Because the non-parties failed to timely file written objections before the time specified for compliance, they have waived any objections to production of the requested documents.

## VI. CONCLUSION

Based on the foregoing, Defendant Arencibia asserts that the non-parties' motion to quash should be denied and they should be ordered to produce the requested documents on or before November 25th, 2024 or if the documents do not exist they should be required to file an affidavit stating what efforts they made to locate the documents and affirming under oath that the requested documents do not exist and also advising whether the documents ever existed and if so what happened to the documents.

Respectfully submitted,

**QUINTERO BROCHE, P.A.**
*Attorneys for Boris Arencibia*
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Tel: (305)446-0303
Fax: (305)446-4503

By: */s/    Frank Quintero, Jr.*
        FRANK QUINTERO, Jr.
        FLORIDA BAR NO.: 399167

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 12, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: */s/    Frank Quintero, Jr.*
        FRANK QUINTERO, Jr.
        FLORIDA BAR NO.: 399167



# EXHIBIT A

FD-302 (Rev. 5-8-10)

**- 1 of 13 -**

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry ___12/01/2020___

    MOHAMMAD MEHDI SALEMI, date of birth (DOB) 5/15/1985, social security number 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, home address 3223 Evergreen Point Rd, Medina, Washington 98039, was interviewed at the Courtyard Marriott Downtown Miami/Brickell, 200 SE Second Ave, Miami, FL. Present during the interview was SALEMI's attorney, Richard Klugh, cellular telephone number 305-903-6900, Assistant United States Attorneys (AUSA) Walter Norkin and Frank Tamen, Federal Bureau of Investigation (FBI) Special Agent (SA) Adam Wolfe and Food and Drug Administration - Office of Criminal Investigations (FDA-OCI) SA Janelle Rudie.

    Prior to beginning the interview, AUSA Tamen covered the proffer agreement. SALEMI stated he understood the terms, agreed to them, and signed the proffer agreement. After being advised as to the identities of the interviewing agents and the nature of the interview, SALEMI voluntarily provided the following information:

    In October 2011, SALEMI went to work for STEPHEN COSTA at NULINE PHARMACEUTICALS. In early 2012, NULINE was scraping by selling generic pharmaceuticals. NULINE was barely making a profit. One day COSTA showed SALEMI their bank account which had approximately $1.5 million in it. SALEMI did not see how that was possible. In February 2012, COSTA called SALEMI to tell him that he had been indicted in New York for drug diversion. He told him about selling to MOM'S PHARMACY and that one of his shipments had been intercepted on its way there. That is when SALEMI really found out how COSTA was making so much money through the sales of diverted pharmaceuticals.

    SALEMI stayed on to work at NULINE because he did not have any other opportunities and was not involved with COSTA's charges in New York. NULINE at the time was owned by some sketchy Armenians. SALEMI worked with a sales team led by JASON SMITH to find customers for them. NULINE started

---

Investigation on __11/06/2020__ at Miami, Florida, United States (In Person)

File # 2451-MM-113449-CruzHernandez          Date drafted __11/06/2020__

by WOLFE ADAM

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020 , Page  2 of 13

selling a lot of Tramadol and Hydrocodone through SMITH and his team, and wound up selling to dead patients in Alabama. The Drug Enforcement Agency (DEA) and the Alabama Board of Pharmacy got involved and shut that scheme down.

In late 2012, SALEMI told COSTA that they had to come up with something new or they would be out of money. COSTA said they could get diverted drugs and find a new customer. SALEMI agreed. COSTA and SALEMI tasked one of their salesmen, MAKO ENDO, to find a customer who they could sell the diverted drugs to. ENDO found GARDEN GROVE PHARMACY to be that customer and they began selling to them. They located new clientele by attending doctor trade-shows in California. COSTA had the connections to get the diverted drugs, and had them shipped either to NULINE or to SALEMI's apartment in Burbank. COSTA, SALEMI, and FARHAD OBEIDULLAH also known as (aka) FUJI were involved in receiving the drugs and shipping them to GARDEN GROVE PHARMACY. SALEMI recalled looking at three boxes sitting in his apartment in Hollywood Hills that COSTA told him were worth over $1 million. The drugs inside were HIV and anti-psychotic medications to include Truvada and Atripla. The drugs targeted for purchases were high-end pharmaceuticals. MOM'S PHARMACY OF NEW YORK was the largest customer of NULINE. GARDEN GROVE PHARMACY was definitely aware the pharmaceuticals they purchased were not coming from a legitimate source. The drugs were shipped to GARDEN GROVE PHARMACY using FedEx. If a wholesaler was offering anywhere north of 5-8% off of the wholesale acquisition cost (WAC), most pharmacies would buy it no matter what.

In October or November, 2012, SALEMI approached COSTA and asked him how they could move on from just selling diverted drugs to GARDEN GROVE PHARMACY. COSTA said he was flying to Los Angeles from New York, and he had somebody he wanted to meet with SALEMI in Phoenix, Arizona. SALEMI knew that COSTA could not fly to Phoenix because of his bond conditions, but COSTA said they were driving. COSTA and SALEMI drove to meet the owner of LLC WHOLESALE SUPPLY LLC (LLC), JIM LIVANAVAGE. COSTA's friend IRA GROSS had introduced him to LIVANAVAGE. After all three of them went out to eat, COSTA asked SALEMI to wait outside while COSTA and LIVANAVAGE had a private meeting. LIVANAVAGE told SALEMI to go meet another LLC employee, JOSH JOLES, in the meantime. SALEMI did not meet any other LLC employees at this time.

After that meeting, SALEMI understood that LIVANAVAGE wanted to buy from

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020 , Page  3 of 13

COSTA, but COSTA was not comfortable selling to them through NULINE since they were both in the middle of legal issues. Not long after that SALEMI found a company to purchase drugs from called QUALITY KING. NULINE started purchasing from QUALITY KING and SALEMI would look at the pedigrees to see who they were buying from. QUALITY KING was a large company that would buy and sell drugs from around the world, primarily in Puerto Rico and sell in the United States. SALEMI saw that they purchased from a lot of companies in Puerto Rico such as, WHOLESALERS GROUP INC. (WGI) dba DROGUERIA BAYAMON, BETANCES, and others. Before SALEMI knew it, FUJI had already contacted WGI. It turned out WGI had closed down recently. The owner of WGI, JUAN ORTIZ NEGRON, had taken all of his money out of the company and shut their doors. SALEMI also found out that WGI was an authorized distributor (AD). It was crazy that an AD was closing its doors because that was like gold in the pharmaceutical industry. He also learned of a past criminal history for ORTIZ.

    In early 2013, COSTA flew out to Puerto Rico and met with ORTIZ. When he came back he told SALEMI that they had to buy the company, that it was an opportunity of a lifetime. COSTA told SALEMI to keep selling drugs to GARDEN GROVE PHARMACY, to maintain a cash flow, but also to take money from NULINE and transfer it to one of SALEMI's companies, MAS EXPRESS CORP, in order to purchase WGI. Overall, NULINE, which was later renamed RXCHANGE, sold approximately $6 to $8 million in diverted drugs to GARDEN GROVE. COSTA controlled all the money and would tell SALEMI where to send it when they received payment. RXCHANGE had multiple bank accounts at OneWest Bank, or a similarly named bank owned by STEVE MNUCHIN, America's United Bank, and US Bank. COSTA also asked SALEMI to transfer money to somewhere in Belize, which SALEMI did not like because it was so blatant what he was doing.

    In the summer of 2013 COSTA and SALEMI went to Puerto Rico to purchase WGI. COSTA was familiar with Puerto Rico because his wife attended medical school in Ponce, Puerto Rico. COSTA and SALEMI met with another wholesaler in Puerto Rico called B&Y, where COSTA knew two brothers, one of whom was named SULTAN. B&Y had been selling to the MINNESOTA INDEPENDENT COOPERATIVE (MIC) along with COSTA. SALEMI did not like the business and they decided to push ahead with purchasing WGI. They met with ORTIZ and his daughter LILYBETH ORTIZ and worked out a deal to purchase 50% of the shares of the company. SALEMI came on as CEO and ORTIZ would remain a 50% shareholder but

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020  , Page  4 of 13

would not make any decisions associated with the company. LILYBETH would remain as a manager at WGI to assist SALEMI with operating the company.

In late October 2013, COSTA told SALEMI to go to Miami and attend a Miami Heat basketball game with his friend FRANK ALVAREZ. SALEMI knew the name from the New York indictment but had never met ALVAREZ and did not know why COSTA wanted them to meet. They got along well and explained to each other what they did relative to COSTA and the pharmaceuticals.

When SALEMI got WGI opened back up he needed to find cheap medicine. Some of the vendors that SALEMI contacted were SALUS, CROWN, and M.E., but they could not sell enough to WGI. COSTA told SALEMI that he would start purchasing from ZANS PROVIDERS. These were obviously diverted drugs. COSTA told him his contact at ZANS was a woman named LEAH SOLOMON. SALEMI was to contact her if there were any issues with the drugs or paperwork. SALEMI knew that COSTA was getting a large percentage of the ZANS profits.

SALEMI and JOLES stayed in touch over time but their contact was minimal. After WGI began buying from ZANS, SALEMI reached out to JOLES and told him they had inventory to sell. LLC could buy everything WGI had leftover after offering to pharmacies. SALEMI could sell at a higher profit to pharmacies rather than selling to another wholesaler. JOLES started buying right away and always paid on time.

During this time period 2013-2014, COSTA also had FUJI and ROBBIE JOYNER open up SEC WHOLESALE in South Carolina. One of the places SEC WHOLESALE sold to was BONITA PHARMACEUTICALS. COSTA and ALVAREZ were sending diverted drugs there. FUJI and JOYNER screwed that company up quickly and got arrested. SALEMI and FUJI did not really get along well. COSTA also set up a friend named MAGGIE with a company called GULF COAST in Mobile, Alabama. That one never really got off the ground.

WGI purchased from ZANS for about eight months before COSTA shut it down. The next vendor was called MORRIS DISTRIBUTORS. COSTA opened this one up as well using Cuban refugees as straw owners on the company registration and the bank accounts. SALEMI did not know how they found these Cubans but ALVAREZ definitely knew. The Cubans were typically paid $5,000 a month while the business was running. Whoever recruited the Cubans would get around 10 to 15% of the money they laundered. Up until he went to prison in 2016,

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020 , Page  5 of 13

COSTA was SALEMI's contact for all the vendors. Everything went through
COSTA and he did not share a lot of the info with SALEMI. SALEMI would
receive a text message from COSTA directing who he should send money
to. SALEMI never met any of the straw owners. They usually set up the
vendors to mimic legitimate companies, which was COSTA's idea. IPC and
VALLEY WHOLESALE were the names of other vendors after MORRIS. They probably
used approximately 20 variations of 8 different names and changed the names
every eight to ten months. ALVAREZ is who really explained how the money
laundering side worked to SALEMI. They would get all these Cubans to open up
bank accounts and transfer money from account to account in smaller
increments until construction workers could write checks and cash them, and
then give the cash to the main people. Many of the Cuban refugees would be
sent back to Cuba after providing their services. The individuals who would
most likely know more about the use of the Cuban refugees were ELI
aka SPANKY, WAYNE HAZELWOOD, LAZARO HERNANDEZ, and JAVIER
ARBOLAEZ. SALEMI knew that one of the main guys who controlled the money
laundering early on was named BLACKBIRD FRANK. He was Cuban, mostly bald,
and lived in Miami. He was a contact of COSTA's.

At the end of 2014, SALEMI started to butt heads with LILYBETH ORTIZ and
decided he had to buy her out. In May 2015, SALEMI purchased the remaining
50% of WGI. Then he opened up a corporation in Delaware called WHOLESALERS
GROUP LLC in order to manage the banking easier. He opened it in the state
of Delaware at the advice of attorneys. He opened bank accounts under
WHOLESALERS GROUP LLC at Wells Fargo and Bank of America. In 2016, SALEMI
 opened WHOLESALERS GROUP OF WASHINGTON LLC (WGW) in the state of
Washington. SALEMI planned to use WGW for the U.S. operation and WGI would
continue as a small wholesaler for the Puerto Rico market.

Prior to going to prison COSTA sat down with ALVAREZ, CARLOS GONZALEZ,
and SALEMI to discuss how things would continue to operate while he was
inside. ALVAREZ was to take care of the products, meaning he would buy and
ship the diverted drugs to WGI. GONZALEZ would be in charge of the money,
meaning he would send SALEMI account info for the vendors. COSTA told them
at the meeting he wanted 10% of the profits while he was in prison.
SALEMI did not know exactly how he was to receive this money but it would
have been in cash and delivered to his family members. COSTA had almost all
of his assets and money hidden with trusted family members including his

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020 , Page  6 of 13

dad, his uncles, his brother FRANK, his cousin CARLOS CASANUEVA, and his
wife ANNIE. COSTA gave GONZALEZ his cell phone with all his contacts before
he went away. GONZALEZ would go visit COSTA in prison weekly. SALEMI visited
COSTA in prison a few times but not often. COSTA would also call and message
SALEMI using apps called Telegram or Signal from a cell phone he had in his
prison cell. Once GONZALEZ took over handling the money things got sloppy.
GONZALEZ was sending him vendor accounts that had names having to do with
car companies and computer companies. SALEMI had to call them and tell them
he could not be sending money to pay for drugs to car and computer
companies.

   SALEMI did not know who was supplying the drugs, but he knew when they
switched suppliers based on their "strength." If a supplier was strong, he
could put together million dollar orders with multiple bottles per lot
number. A week supplier would put together smaller orders with "one's and
two's" per lot number.

   By mid-2014, SALEMI began to cross-sell to LLC's pharmacies. JOLES
contacted SALEMI and told him that in order to avoid that, JOLES wanted to
buy everything he had. SALEMI could get much better prices from pharmacies
than he could from another wholesaler. But pharmacies were a much bigger
pain to deal with than selling to wholesalers. SALEMI told JOLES that he
would have to buy at least 10-12% off of WAC to make it worth it. After a
few in-person conversations, it was agreed that JOLES would buy everything
from WGI at 15-17% off WAC. For perspective, purchasing at 4-5% off WAC is a
huge red flag that the drugs could be diverted, especially directly from a
manufacturer, such as WGI's pedigrees purported. Sometimes SALEMI would sell
short-dated products to JOLES at 30% off WAC or even more. Occasionally
JOLES would tell SALEMI that he had brought on another vendor and tell
SALEMI that he needed to lower his prices or supply him with more product.
SALEMI was comfortable with the amount of business he was doing with
JOLES and they had discussed how 17% was the lowest they should regularly
have on the invoices to not be "obvious."

   It was clear to SALEMI that even after he exited the company on
paper, LIVANAVAGE still ran LLC and that JOLES had to run any big decisions
through him. Once MURPHY and MULLIGAN came in as part owners, they put a lot
of pressure on JOLES to boost sales. SALEMI did not know LIVANAVAGE's deal
with JOLES and the others, but he was very much still involved with LLC. It

FD-302a (Rev 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020  , Page  7 of 13

was his baby, since he opened it years ago.

JOLES' warehouse manager, DAVID GARCIA SR., was well aware that they were buying diverted drugs. He was a former Mckesson employee, and he conducted the quality control at LLC. The warehouse was who brought up an issue with WGI shipments coming in from Miami, when the paperwork said they were coming from Puerto Rico. JOLES called SALEMI "aggresively" telling him to fix it. This was unusual for JOLES. When SALEMI asked him why he was being so aggressive, JOLES explained that MURPHY and MULLIGAN were putting a lot of pressure on him to get it fixed quickly. JOLES told SALEMI he needed to either get a warehouse in Miami or the drugs needed to come from WGI in Puerto Rico.

Other red flags the warehouse raised were smears on bottles, extra lot numbers on the bottom of bottles, the bottom of the cap would be yellow, and several times the contents of the bottles would be different than what should have been in it. JOLES messaged SALEMI via Telegram anytime these issues would come up. On one occasion, around April 2018, a bottle with the wrong pills inside made it to GARDEN GROVE PHARMACY and a pharmacist reported it to GSK/VIIV. A second time, a Gilead bottle contained rocks inside that made it to a patient. A third time, a pharmacy got a bottle of Intelence with the wrong dosage medication inside. JOLES never threatened to cease doing business with WGI or ask any further questions. He just told SALEMI to be more careful. JOLES was usually able to get out in front of the incidents with the pharmacy so they didn't get back to FDA or the state boards of pharmacy. JOLES would call the pharmacies and give them discounts and tell them he would take care of reporting the bottle so the pharmacy would not have to deal with the paperwork. Pharmacies usually took him up on his offers. Sometimes pharmacies would send bottles back because they didn't like the way it looked. JOLES would get the bottle back, check it out and if he did not think it was that bad he would send it out to another pharmacy. Pharmacies would raise issues like this with LLC at least three to four times a year.

In late 2013 COSTA brought another friend on board named JORGE PAIZ. SALEMI and PAIZ became friends as well. PAIZ had been working in Tampa for COSTA at SLINGSHOT DISTRIBUTORS. SALEMI came across another failing wholesaler in Ponce, Puerto Rico, called DROGUERIA LAS ROSAS INC (DLR). DLR was owned by a woman named BERTHA SANTIAGO CONDE. SALEMI had met with her

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020 , Page  8 of 13

and told COSTA about the company. Purchasing DLR did not make sense to
SALEMI, but COSTA wanted to run with it. He asked SALEMI how they could fund
PAIZ to buy it. PAIZ knew they were selling diverted drugs but he was
enticed by how much money they were making. COSTA had a way of making people
want to live like he did. In 2014, COSTA negotiated the price with CONDE.
COSTA instructed SALEMI to wire approximately $140,000 from his MAS EXPRESS
account to COPA FINANCIAL LLC, a business account held by PAIZ. PAIZ bought
DLR for approximately $250,000. The other money came from COSTA.

Once PAIZ was on board, SALEMI explained how everything worked with the
vendors in Miami and how LLC would buy everything. JOLES started buying from
DLR as soon as they got up and running. SALEMI got a 5% commission on all
the DLR sales to LLC. PAIZ brought his longtime friend JAVIER RIVAS to help
at DLR. SALEMI had not heard from RIVAS in a long time because
RIVAS threatened to kill SALEMI, PAIZ and their families. This was unrelated
to the diverted drug scheme, but instead had to do with a group text they
had about stock trading. RIVAS felt the others were making fun of him.

COSTA wanted to set up a third party logistics (3PL) company with SOLOMON
called ATLANTIC DISTRIBUTORS. SOLOMON was working for SALEMI during this
time in sales, but she really just worked directly for COSTA. Using this
company COSTA began selling drugs to LLC under the name of DLR without PAIZ
knowing. A "bad bottle" was sold this way and got through to a pharmacy.
The Board of Pharmacy got involved and was investigating DLR for a bottle
that PAIZ had no idea got sold under his company's name. PAIZ got really
scared after this and wanted out. He said he did not want to go to prison.

After PAIZ backed out, ALVAREZ recommended that KADIR DIAZ take his
place. SALEMI knew DIAZ already. He had gone to Puerto Rico with SALEMI to
help him settle in back in 2013. SALEMI had resided at two addresses during
his time in Puerto Rico, both in San Juan. DIAZ took over DLR and things
kept running as they had been. Although PAIZ wanted out from DLR he did not
want to stop making money. He asked SALEMI if there was anything he could do
so that he could continue to earn. SALEMI told PAIZ he could take over the
paperwork, which would allow PAIZ to make 5-7% off the sales. This included
invoices, pedigrees, and vendor email contacts.

On the last weekend in January, 2016, SALEMI invited JOLES to come
down to Miami on a social visit. SALEMI booked rooms at the ONE HOTEL for

FD-302a (Rev 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of (U) MOHAMMAD SALEMI interview _____ , On 11/06/2020 , Page 9 of 13

himself and JOLES. SALEMI also told ALVAREZ to join them. When ALVAREZ
showed up however, he brought GONZALEZ, DIAZ, and SPANKY with him.
SALEMI didn't like it but everybody hit it off and had a great time.
JOLES and SPANKY exchanged numbers that night and everything changed after
that. SALEMI knew that SPANKY was the right hand man to LAZARO HERNANDEZ aka
"FAT LAZ" aka "SKINNY," one of the biggest suppliers of diverted
pharmaceuticals in Miami. LLC's sales grew exponentially after this meeting
and SALEMI knew it was because HERNANDEZ now had a direct line to JOLES.
During another stay at the same hotel from October 3 to October 8, 2017,
SALEMI booked a room for JAVIER RIVAS under his guest folio in relation to
the business. SALEMI believes RIVAS stayed in the drug diversion business.

After hurricane Maria hit Puerto Rico DLR had to shut down. Shortly after
that, JOLES messaged SALEMI that he had 5 boxes of drugs sitting in his
warehouse with no idea where they came from. SALEMI told him it was not from
him. JOLES learned that DIAZ had sent unsolicited boxes from DLR. That was
how SALEMI learned that DIAZ was still selling to JOLES under DLR, even
though DLR was technically out of business. SALEMI warned JOLES about buying
from DLR after it was shut down, but JOLES said he was ok with
it. JOLES also told him that he had new vendors he was buying from. One was
a company called CAREPRO DISTRIBUTORS. ALVAREZ told SALEMI that DIAZ was
behind CAREPRO. JOLES also told SALEMI that SPANKY was contacting him to put
him in touch with other vendors. SALEMI warned JOLES that SPANKY was not a
businessman like them. He was a street guy and JOLES should be careful
getting involved directly with him. Soon afterward, HERNANDEZ was flooding
JOLES with drugs.

Around the end of August, 2016, SALEMI attended a "Going to prison
sendoff" party for COSTA. JOLES, PAIZ, ALVAREZ, and JAVIER ARBOLAEZ aka "LJ"
attended. They stayed at the ONE HOTEL but also bounced around to other
clubs including THE EAST. They went to dinner that night at the Bagatelle
Miami Restaurant. Everybody knew why they were there, including JOLES.

On another occasion in 2015, SALEMI, JOLES, GONZALEZ, ALVAREZ, and OSCAR
FERREIRA attended a boxing match in Las Vegas between Floyd Mayweather Jr.
and Manny Pacquiao. This was a social trip and nothing specific regarding
the drug diversion scheme was discussed or planned.

After COSTA went away, ALVAREZ wanted to cut GONZALEZ out. GONZALEZ also

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of (U) MOHAMMAD SALEMI interview _____ , On 11/06/2020 , Page 10 of 13

reached out to SALEMI wanting to do some work on his own. SALEMI worked with both of them separately but they both got sloppy. GONZALEZ obviously did not have a strong supplier, and they both had banking issues, issues with front companies, and supply problems. SALEMI went to visit COSTA in prison and told him all about the issues. COSTA told him to contact LJ and he could fix it all. LJ was a strong supplier. He and his dad were both longtime aggregators. Starting in 2017 LJ opened a vendor called HARVARD DISTRIBUTORS who would begin supplying WGI. SALEMI was getting approximately 70% of his supply from LJ, 20% from ALVAREZ, and 10% from GONZALEZ. Everything was running smoothly. JOLES would tell SALEMI what his "hot items" were and the suppliers would tell him what they were getting a lot of.

HERNANDEZ was the main supplier to all three of them. SALEMI knew HERNANDEZ was making approximately $2 million a week. COSTA introduced SALEMI to HERNANDEZ before he went to prison. HERNANDEZ had all of the street vendors in Miami. RUBEN CRUZ, HERNANDEZ and his friend BORIS ARENCIBIA, are the heads of the snake. They control all of the diverted drugs in Miami. Currently, HERNANDEZ is selling through a company called A1A WHOLESALE located in Watchung, New Jersey. Most of the diverted drugs are currently stashed at farms in the Redlands, Florida. Their customer is a man named JOHN LEVITAN who owns a medical company in Louisiana. SALEMI learned most of this info from ALVAREZ. IRA GROSS had connected COSTA to LEVITAN through LLC.

Two other places dealing in diverted pharmaceuticals are RSL WHOLESALE, located in Kent, WA, and TRIPHARMA, located in Kennesaw, WA. RSL WHOLESALE has SALEMI's offer sheet up on their website. They just copied it completely.

JOLES eventually started buying from lots of companies, such as LDD DISTRIBUTORS, GE ENTERPRISES, and PROVEN PHARMACEUTICALS. SALEMI had sold to the real PROVEN PHARMACEUTICALS before, but they didn't like their stuff. SALEMI did not recall exactly what it was they did not like. SOLOMON had brought them on as a client at WGI.

JOLES said the reason he was so comfortable purchasing from all these diverting companies, and even DLR after it was shut down, was because LLC had brought in an attorney named BEN ENGLAND to lay out what they needed in place to "avoid legal issues." ENGLAND was a former FDA attorney who

FD-302a (Rev 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020 , Page   11  of  13

opened a private law firm. SALEMI had also hired ENGLAND to help him with a
different company called MAS PHARMA. JOLES said ENGLAND told him exactly
what he needed to have documented to show that LLC had done their job to
verify the vendor. Then JOLES would just be able to point back to the vendor
if any issues came up. ENGLAND had told SALEMI that if the company on the
pedigree is licensed you are ok to purchase from them. It is not your job to
conduct due diligence as long as they have a license. When JOLES started
buying from WGI, he had SALEMI fill out a GC Compliance form. JOLES also did
a "verification visit" to WGI in Puerto Rico. Later on, he grew complacent
and was not strict on the compliance and verification steps.

   SALEMI made kickback payments to JOLES on multiple occasions. He
transferred money from his account under MAS EXPRESS CORP to JJOLES
ENTERPRISES, LLC. JOLES would also get kickbacks in cash from SPANKY and
DIAZ. They would fly the cash to him and meet him in Las Vegas or Phoenix.

   In May, 2019, when the FBI and FDA executed search warrants at LLC and
WGW, everybody was panicking. SALEMI, JOLES, ALVAREZ, and GONZALEZ were all
calling each other. JOLES said SPANKY was ghosting him. As a result of the
search warrants, JOLES told SALEMI a drug shipment from SPANKY worth $4
million was taken during the search. He also associated SPANKY to
LDD DISTRIBUTORS. ALVAREZ was working with SOLOMON at the time on a new
company called NORTHUP GROUP.

   At the end of 2018, SALEMI wanted to get out of WGI. He told SOLOMON that
he was shutting them down. SOLOMON explained to SALEMI that she knew how the
business worked, and SALEMI should know that her husband was in the business
for years. SOLOMON wanted to open her own wholesaler, using
SALEMI's suppliers. SALEMI told ALVAREZ that he could supply her and told
JOLES to begin buying from her company, NORTHUP GROUP. Somebody on ALVAREZ's
end opened up BETANCES to launder the money. SALEMI did not ask for a
commission on the NORTHUP GROUP sales but ALVAREZ would give him $10,000 in
cash every now and then.

   The interviewing Agent asked about the following companies:

5 RIVERS RX: This was a pharmaceutical consulting company who also brokered
sales deals. It is run by a guy named NEAL LAST NAME UNKOWN (LNU) who
operates in Puerto Rico and Michigan.

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) MOHAMMAD SALEMI interview _____ , On  11/06/2020 , Page  12 of 13

CARIBE RX SERVICE: A pharmaceutical distributor in Puerto Rico.

PREMIER RX: A PBM, or pharmacy benefit management company.

REMEDY RX: A pharmacy.

J&P: A pop-up shop diverting company that JOLES was buying from. He had complained about them before to SALEMI.

ABLE WHOLESALERS: SALEMI was introduced to KEVIN SINGER by JOLES in 2016 in Aventura, Florida. JOLES was introduced to SINGER by GLENN LNU. SALEMI did not know ABLE's exact scheme, but JOLES bought a ton of Spiriva from them. SINGER told him the operations of the business and how they used intra-company transfers of prescription drugs. SINGER explained to SALEMI that his profit was over $3 million a year.

COSTA and HERNANDEZ liked to use casinos to launder their money but he did not know exactly what the strategy was. SALEMI has seen them both gamble with exorbitant amounts of money on poker and blackjack. They primarily use the HARDROCK CASINO but also the MICCOSUKEE casino. They travel to Las Vegas frequently as well. COSTA and HERNANDEZ are both into luxury watches. COSTA, HERNANDEZ and SPANKY are all connected to the owners of CRM JEWELERS in Miami. They like to use the watches to launder their cash. HERNANDEZ and BORIS have some kind of record label that they use to launder their money as well. They may also be using boxing matches to move money. HERNANDEZ uses his sister, MAYELIN, to hide and move his cash around because women do not get looked at as much by law enforcement.

COSTA used his cousin CASANUEVA to handle his real estate transactions and hide money away. CASANUEVA was also COSTA's contact for drugs coming from New York. SALEMI had heard that COSTA had buried barrels of cash in his uncle's backyard, RENE LORENZO, under slabs of concrete.

COSTA cheated on his wife ANNIE often, sometimes in the presence of SALEMI. She found out about that right before COSTA went to prison. Their relationship was very rocky for a while, but COSTA has tried to make it seem like everything is fine recently.

Another person that helped COSTA was EMIL LEVY. He was SOLOMON's boyfriend. She brought him over to Puerto Rico to give him some work. He

FD-302a (Rev. 5-8-10)

245I-MM-113449-CruzHernandez

Continuation of FD-302 of (U) MOHAMMAD SALEMI interview _____ , On 11/06/2020 , Page 13 of 13

ended up doing the fake invoices and pedigrees for WGI. He was never a
formal employee of WGI, and was paid directly by COSTA and SOLOMON. Later he
worked for SALEMI up in Seattle as well.

GRETTY SARMIENTO is a relative of COSTA's who has assisted in his drug
diversion business since he started. She helped teach ALVAREZ was in charge
of the quality control of the drugs.

SA Wolfe scanned and uploaded his interview notes into the digital 1A,
and placed the original interview notes and documents into a 1A envelope.

# EXHIBIT B

FD-302 (Rev. 5-8-10)

- 1 of 3 -

**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD

Date of entry    06/17/2021

CARLOS ROBIN GONZALEZ, date of birth 2/20/1993, social security number 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, residing at 10530 SW 118TH Ave, Miami, Florida, 33186, cellular telephone number (305) 972-6989, was telephonically interviewed due to the ongoing Covid-19 pandemic restrictions on in-person meetings. Present during the interview was GONZALEZ's attorney, Todd Yoder, telephone number 305-379-6667, Assistant United States Attorneys (AUSA) Walter Norkin and Frank Tamen, Federal Bureau of Investigation (FBI) Special Agent (SA) Adam Wolfe and Food and Drug Administration - Office of Criminal Investigations (FDA-OCI) SA Janelle Rudie.

Prior to beginning the interview, AUSA Norkin went over the proffer agreement GONZALEZ had previously signed. GONZALEZ stated he understood the terms and agreed to continue with the interview. After being advised as to the identities of the interviewing agents and the nature of the interview, GONZALEZ voluntarily provided the following information:

Before STEPHEN COSTA reported to prison he had GONZALEZ and FRANK ALVAREZ come over to his house. COSTA wanted to introduce ALVAREZ to FRANK VALCARCE. COSTA said VALCARCE could broker deals for product and provide a change avenue for the money. VALCARCE went by the nickname "BLACKBIRD" and drove a white Mercedes S63. COSTA also introduced them to another smaller supplier named JAP. GONZALEZ did not know his real name. He was nicknamed JAP because he looked Asian, although he was Cuban. COSTA instructed ALVAREZ that he was to make sure COSTA, GONZALEZ, and the rest of his crew was paid while COSTA was in prison. GONZALEZ did not know what COSTA's cut was to be or how ALVAREZ was to get him the money. COSTA and ALVAREZ seemed to have that worked out.

COSTA also introduced ALVAREZ to JAVIER ARBOLAEZ, aka "LJ." LJ stood for Lumberjack because he was a big strong guy. ARBOLAEZ was another person who could source product. His father was in the business for a long time, and they had ways to launder money through the Dominican Republic. Their product

---

Investigation on   12/16/2020   at   Miramar, Florida, United States (Phone)

File #   245K-MM-113449-CruzHernandez                          Date drafted   01/20/2021

by   WOLFE ADAM

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency

FD-302a (Rev. 5-8-10)

245K-MM-113449-CruzHernandez

Continuation of FD-302 of (U) CARLOS GONZALEZ phone debrief _____ , On 12/16/2020 , Page 2 of 3

may come from the Dominican Republic GONZALEZ knew that ARBOLAEZ visited COSTA in prison multiple times.

When COSTA finally went to prison he left GONZALEZ and COSTA's wife, ANNIE GONZALEZ, with a lot of debt and bills to pay. GONZALEZ was making payments on COSTA's 2014 Mercedes and his credit card bills, particularly his Discover card which had a high balance. At first GONZALEZ was using his own money to pay COSTA's bills, but COSTA eventually gave him a CitiBank debit card to use.

The interviewing Agents asked why GONZALEZ was paying COSTA's bills while he was in prison with his own money. GONZALEZ responded that COSTA had a way of making people do things for him. GONZALEZ finally stopped making the payments because he could not afford to do so anymore. SALEMI paid off COSTA's credit card bill, which was somewhere around $20,000, and made his car payments for his Mercedes and Range Rover as well.

COSTA placed all of his assets in the names of his trusted family members. He had a warehouse in the Tampa/St. Petersburg area that he sold and put the money in his wife's name. COSTA purchased a property on 211 Davis St, which was also the name of a company COSTA used. That property was under GONZALEZ name. COSTA's uncle, RENE LORENZO, was one of his most trusted family members. He had properties under his name that belonged to COSTA in reality. LORENZO lives in Weston, FL. CARLOS CASANUEVA used to be very involved with COSTA and held properties under his name, but he got out and moved up north with his family.

The interviewing Agent asked GONZALEZ how he came to process diverted pharmaceuticals out of his parent's house. GONZALEZ responded that ALVAREZ and GONZALEZ had discussed that they did not want to keep renting places in their own names, so GONZALEZ offered doing it at his parent's house for a while.

The interviewing Agent asked if GONZALEZ had any more information about an individual named "KIQUE". GONZALEZ went to his house one time, which was around NW 8th or 9th St and 137th Avenue in Miami. He drove an older black, BMW 6 series at the time.

SA WOLFE scanned and uploaded his original interview notes and placed them into the digital 1A, and placed the original interview notes into the

FD-302a (Rev. 5-8-10)

245K-MM-113449-CruzHernandez

Continuation of FD-302 of  (U) CARLOS GONZALEZ phone debrief _____ , On  12/16/2020 , Page  3 of 3


physical 1A envelope.

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 14-20550-CR-ALTONAGA**

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**LAZARO DANIEL COLLAZO**, *et al.*,

Defendants.
_____/

**ORDER**

**THIS CAUSE** came before the Court on Defendant, Lazaro Daniel Collazo's ("Collazo['s]") Motion for the Issuance of Rule 17(c) Subpoenas and to Compel the United States Attorneys' Office and Major League Baseball to Comply . . . (the "Motion") [ECF No. 145], filed November 20, 2014.  The United States of America (the "Government") filed a Response . . . ("Government Response") [ECF No. 174] on December 8, 2014.  The Office of the Commissioner of Baseball ("MLB") filed an Opposition . . . ("MLB Response") [ECF No. 175] on December 8, 2014.  Collazo filed a Collective Reply . . . ("Reply") [ECF No. 179] on December 15, 2014.  The Court has carefully reviewed the parties' written submissions and applicable law.

Collazo seeks the production of myriad communications and documents from the Government and MLB.  (*See* Mot., Ex. 1 (the "MLB Subpoena" and the "Government Subpoena") [ECF No. 145-1]).  He asserts the documents requested from MLB "go directly to the heart of the charges against Mr. Collazo and . . . would show that MLB directly influenced/altered the testimony of the cooperating witnesses against Mr. Collazo." (Mot. 3

CASE NO. 14-20550-CR-ALTONAGA

(alteration added); *see also id.* 13–14). As for the documents requested from the Government, Collazo asserts they must be produced because they were "obtained by the Government by solicitation or voluntarily from third persons and/or entities." (*Id.* 22 (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951))). He argues Anthony P. Bosch, expected to be a key witness in Collazo's prosecution, violated the law and his plea agreement with the Government, "yet no negative action was taken by the" United States Attorneys' Office (the "USAO"). (Mot. 23; *see also id.* 29).

The Government and MLB oppose the Motion. The Government asserts the document requests are insufficiently specific, overly broad, and would require disclosure beyond the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), and related cases. (*See* Gov't Resp. 4–5, 7–16). MLB contends the information requests are a "fishing expedition," and Collazo cannot demonstrate the materials sought are relevant or admissible, or described sufficiently specifically. (MLB Resp. 1).

## I. LEGAL STANDARD

Rule 17(c) of the Federal Rules of Criminal Procedure governs the use of subpoenas *duces tecum* in federal criminal proceedings. *See United States v. Silverman*, 745 F.2d 1386, 1397 (11th Cir. 1984). "A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." FED. R. CRIM. P. 17(c)(1). "On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." *Id.* 17(c)(2). A party seeking to subpoena documents "must clear three hurdles: (1) relevancy; (2) admissibility; [and] (3)

2

CASE NO.  14-20550-CR-ALTONAGA

specificity."  *United States v. Nixon*, 418 U.S. 683, 700 (1974) (alteration added); *see also United States v. Marshall*, No. 07-20569-CR, 2008 WL 2474662, at *1 (S.D. Fla. Jun. 17, 2008) (acknowledging *Nixon* as the legal standard).  A "subpoena for documents under Rule 17 'was not intended to provide a means of discovery for criminal cases'" but to "'expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials.'"  *United States v. Brown*, No. 11-60285, 2013 WL 1624205, at *3 (S.D. Fla. Apr. 15, 2013) (quoting *Nixon*, 418 U.S. at 698–99).  The application for such a subpoena must be made in good faith and "not [be] intended as a general 'fishing expedition.'"  *Nixon*, 418 U.S. at 700 (alteration added).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."  FED. R. EVID. 401 (alteration added).  "Courts have noted that the specificity and relevance elements are somewhat heightened in that they require more than the title of a document and conjecture as to its contents."  *Brown*, 2013 WL 1624205, at *4 (citation and internal quotation marks omitted).  Rule 17(c) "only reaches specifically identified documents that will be admissible as evidence at trial . . . ."  *Silverman*, 745 F.2d at 1397 (citations omitted).

"Enforcement of a pretrial subpoena *duces tecum* must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues."  *Nixon*, 418 U.S. at 702.  "Without a determination of arbitrariness or that the trial court finding was without record support, an appellate court will not ordinarily disturb a finding that the applicant for a subpoena complied with Rule 17(c)."  *Id.* (citations omitted).

3

CASE NO. 14-20550-CR-ALTONAGA

## II. ANALYSIS

### A. The Government Subpoena

The Government Subpoena requests the following: 1) "any and all communications" between the USAO and seven criminal defendants and their attorneys, as well as between the USAO and prior counsel for Collazo; 2) "any and all communications" between the USAO and "any and all individuals granted immunity . . . in connection with any investigation concerning Biogenesis of America, LLC, and/or the related distribution of Performance Enhancing Substances to minors and/or major league baseball players" and their attorneys; and 3) "any and all documents . . . and/or communications turned over . . . to the USAO from a third person . . . in connection with the investigation concerning Biogenesis of America, LLC, Lazaro Collazo, and/or the related distribution of Performance Enhancing Substances . . . ." (Government Subpoena App. A (alterations added)).

These broad requests are precisely the type of "fishing expedition" a Court may not permit in a Rule 17(c) subpoena. *Nixon*, 418 U.S. at 700 (internal quotation marks omitted). The requests do not even purport to name any "specifically identified documents" required for the enforcement of a Rule 17(c) summons, *Silverman*, 745 F.2d at 1397 (citations omitted), instead seeking broad swaths of data in the Government's possession. The Motion contains mere conjecture as to the contents of these numerous, unnamed documents, and it is therefore insufficient to warrant the issuance of a Rule 17(c) subpoena to the Government. *See Brown*, 2013 WL 1624205, at *4 (citation omitted).[1]

---

[1] A portion of Collazo's Reply appears to concede the request is the type of fishing expedition permitted in civil litigation but disallowed by Rule 17(c); one heading is captioned, "The Requests . . . Are Sufficiently Specific *to Lead to* Relevant and Evidentiary Documents . . . ." (Reply 3 (alterations and

4

CASE NO. 14-20550-CR-ALTONAGA

Collazo's reliance on *Bowman* is misplaced (*see* Reply 12–14), as the admittedly broad language of that decision has been limited by the requirements of *Nixon*. *See Nixon*, 418 U.S. at 698 (noting "cases decided in the wake of *Bowman* have generally followed Judge Weinfeld's formulation in *United States v. Iozia*, 13 F.R.D. 335, 338 ([S.D.N.Y.] 1952), as to the required showing" (alteration added)). Collazo acknowledges a Rule 17(c) subpoena to the Government must satisfy the standards established in *Nixon*. (*See* Mot. 9).

### B. The MLB Subpoena

The MLB Subpoena requests the following categories of materials: 1) "any and all documents . . . and/or communications between" MLB and selected government entities, including "any other State and/or Federal Law Enforcement Agency, concerning Biogenesis of America, LLC, Biokem, LLC, Anthony P. Bosch, Carlos Acevedo," and Collazo; 2) "any and all agreements . . . and/or other documents concerning payments made by or on behalf of [MLB] to or for the benefit of" a number of individuals and businesses, including "any written agreements between any of the individuals and/or entities referenced herein and" MLB; 3) "any and all documents . . . and/or communications relating to the 2009 investigation of Manuel Ramirez, Anthony Bosch and/or Pedro Bosch in relation with the distribution and/or use of Performance Enhancing Substances"; 4) "any and all memorandums, proffers, statements, interview notes, and/or transcripts in connection with meetings with Anthony Bosch, Carlos Acevedo, and/or any other witness involved in the investigation pertaining to" them, Collazo, or two businesses; and 5) "any and all lists, correspondences, and/or documents by Anthony Bosch (and/or his attorney/representative) to MLB identifying and describing with particularity any documents

---

emphasis added; capitalization omitted)).

CASE NO.  14-20550-CR-ALTONAGA

destroyed, amended, sold or otherwise made unavailable prior to the effective date of the June 3, 2013 agreement between Bosch and MLB."  (MLB Subpoena App. A (alterations added)).

The first, third, and fourth categories of the MLB Subpoena are improper for the same reasons as the Government Subpoena.  By seeking "any and all" documents "concerning," "relating to," or "in connection with" a myriad of individuals, businesses, government entities, and investigations, Collazo fails to indicate with the requisite specificity the documents he requests or how they will be admissible.  *See Brown*, 2013 WL 1624205, at *5 (calling Rule 17(c) subpoena a "fishing expedition" when it sought an "investigative file 'as it relates to Mr. Moss's involvement with Mr. Brown,'" documents "'containing any facts which touch upon Mr. Moss's involvement with Mr. Brown,'" and correspondence "'which includes information touching upon Mr. Moss's involvement with Mr. Brown'" (brackets, emphasis, and citation omitted)).  The Court now turns to the second and fifth categories of requests.

### 1. The Second Category

As for the second category of requested documents, the Court is satisfied Collazo makes the requisite showing under *Nixon* entitling him to a portion of the requested documents.  This category concerns agreements and documents about payments made by or on behalf of MLB to a number of individuals with information relevant to the prosecution of Collazo.  Collazo points to an agreement between MLB and Bosch requiring MLB to pay for his attorneys and security services, and further notes testimony given by attorney Susy Ribero-Ayala indicates MLB also paid for the attorney for Ms. Ribero-Ayala and a publicist for Bosch.  (*See* Mot. 12–14).  Collazo notes this appears to conflict with the MLB-Bosch agreement, which states MLB would not provide "anything else of value to Bosch" besides what is explicitly stated in the agreement.  (*Id.*

6

CASE NO. 14-20550-CR-ALTONAGA

13 (footnote call number and internal quotation marks omitted)).

Collazo posits these and other additional benefits from MLB could influence Bosch's testimony — presumably in ways not otherwise disclosed by the Government pursuant to its *Brady* and related obligations, if the Government did not possess the information. (*See id.* 16, 18). MLB argues this request fails to sufficiently identify specific documents by seeking "'any and all'" records or agreements with or payments to individuals or entities. (MLB Resp. 10). It also asserts Collazo has failed to show the materials sought are admissible, such as for impeachment; he instead casts a wide net hoping to find an agreement that exposes the bias of a trial witness. (*See id.* 11).

As for specificity, while it is true Collazo does not identify specific documents evidencing payment or other agreements between MLB and the individuals or entities — for instance, a dated receipt to a specific person — his request is sufficiently specific to satisfy Rule 17(c). By confining the request to documents "concerning payments," Collazo makes a good-faith, specific, and relevant request for information. Further, Collazo points out that payments or benefits conferred upon a witness are admissible for purposes of impeachment. In the Eleventh Circuit, "impeachment materials may be subpoenaed by a Rule 17(c) subpoena" if relevant and specific. *Brown*, 2013 WL 1624205, at *4. MLB argues the admissibility of this evidence depends "on whether and to what extent the witness in fact testified and incriminated the defendant, and whether the agreement provided some inducement to testify in some way regarding the defendant." (MLB Resp. 11 (citing *United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988)) (footnote call number omitted)). Yet, as noted in *LaRouche Campaign*, "Observation of this general rule [that impeachment evidence is only permitted if the

7

witness testifies], however, is left to the sound discretion of the district court." *LaRouche*

*Campaign*, 841 F.2d at 1180 (citation omitted). Exercising its discretion, and noting the

witnesses who will testify are not yet known, the Court finds Collazo's second category proper in

part.

Two modifications are necessary. *See* FED. R. CRIM. P. 17(c)(2). First, the Court

perceives of no scenario in which representatives of the Department of Justice or the USAO for

the Southern District of Florida would testify in this matter. Thus, these two entities are

excluded from the second category. Finally, the last sentence of this category impermissibly

expands the scope of the request beyond the specific area of "payments" contained in the first

sentence. The last sentence instead seeks "any written agreements between" MLB and the

identified individuals and entities — agreements that could include anything imaginable, and the

relevance of which has not been explained by Collazo. (*See* Mot. 12–18). Accordingly, the last

sentence is further excluded from this second request. *See Brown*, 2013 WL 1624205, at *4

(noting courts "require more than the title of a document and conjecture as to its contents"

(citation and internal quotation marks omitted)).

### 2. The Fifth Category

Bosch's agreement with MLB required him to describe documents destroyed, altered, or

transferred to others, and identify individuals who might have access to those documents. (*See*

Mot. 21). Collazo's fifth category seeks production of the list Bosch presumably provided to

MLB in fulfillment of his obligation, contained in Section B(2) of the June 3, 2013 agreement.

(*See* MLB Subpoena App. A). Collazo argues this list would bear on the integrity and reliability

of the medical records at issue in his prosecution. (*See* Mot. 21–22). MLB, meanwhile, argues

CASE NO. 14-20550-CR-ALTONAGA

Collazo does not assert the list exists, or how such a list would be admissible given it would be considered hearsay. (*See* MLB Resp. 15).[2]

Collazo does not address MLB's admissibility argument in the relevant section of the Reply. (*See* Reply 35–36). Instead, he argues the "reliability of these records [is] critical to the charges" and the list is necessary to verify the authenticity of the records. (*Id.* 36 (alteration added)). Still, throughout the Reply, Collazo makes a number of arguments the requested documents could be used as impeachment against witnesses. (*See, e.g., id.* 10–11). The Eleventh Circuit has sanctioned the use of a subpoena to obtain out-of-court, written statements intended for use as impeachment against the defendant, a prospective witness. *See Silverman,* 745 F.2d at 1396 (noting subpoena sought "complaints made against him by his former clients or The Florida Bar"). Similarly, the statements Bosch previously produced to MLB concerning the medical records' modification or destruction could be used to impeach his expected testimony about the accuracy of those records. As with the second category of requested documents, the scope of this request is limited, specific, and clearly relevant. Accordingly, the fifth category is permissible.

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that the Motion [ECF No. 145] is **GRANTED in part** and **DENIED in part** as stated herein. MLB shall produce the required documents on or before **January 22, 2015**. The Government Subpoena shall not issue.

---

[2] MLB also argues Rule 17(h) forbids disclosure of any such list. (*See* MLB Resp. 15). "No party may subpoena a statement of a witness or of a prospective witness under this rule. Rule 26.2 governs the production of the statement." FED. R. CRIM. P. 17(h). But "Rule[] 17(h), Rule 26.2, and the Jencks Act only apply to statements in the government's possession." *United States v. Young,* No. 03-20400 BV, 2004 WL 784840, at *2 (W.D. Tenn. Mar. 4, 2004) (alteration added; citations omitted).

CASE NO.  14-20550-CR-ALTONAGA

**DONE AND ORDERED** in Miami, Florida, this 9th day of January, 2015.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

10